UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

U.S. MAGISTRATE JUDGE

EL PASO DIVISION

UNITED STATES OF AMERICA )No. EP:18-MJ-08890-RFC

vs.                        )El Paso, Texas

ISAC GAMEZ RUIZ            )
                           )December 6, 2018
_____


PRELIMINARY/DETENTION HEARING

Before the Honorable Robert F. Castaneda


A P P E A R A N C E S:
-----------------------
FOR THE GOVERNMENT:

MR. RYAN SEARS
-------------------------
Assistant United States Attorney
700 E. San Antonio, Suite 200
El Paso, Texas 79901


FOR DEFENDANT:

MR. EDGAR HOLGUIN
----------------------------
700 E. San Antonio Avenue, Suite D-401
El Paso, Texas 79901


     Proceedings reported by stenotype.  Transcript produced by

computer-aided transcription.

THE COURT:  We'll call the next case, 18-8890, the United States of America versus Isac Gamez Ruiz.

MR. SEARS:  Good morning, Your Honor, Ryan Sears for the United States.

MR. HOLGUIN:  Good morning, Your Honor, Edgar Holguin for Mr. Gamez, ready.

THE COURT:  Alright.

MR. SEARS:  Your Honor, at this time the Government would call Special Agent Matthew Gauer to the stand.

THE COURT:  Do you swear to tell the truth, the whole truth, and nothing but the truth so help you God?

AGENT GAUER:  I do.

THE COURT:  Thank you.

MR. SEARS:  Good morning, Special Agent.

AGENT GAUER:  Good morning.

MR. SEARS:  Can you please state your full name and spell your last name for the Court?

AGENT GAUER:  Matthew Gauer.  The last name is G-a-u-e-r.

MR. SEARS:  Special Agent, who do you work for?

AGENT GAUER:  The Drug Enforcement Administration.

MR. SEARS:  How long have you been with the DEA?

AGENT GAUER:  Since April 2015.

MR. SEARS:  Were you involved in law enforcement prior to that?

AGENT GAUER:  No, sir.

MR. SEARS:  You are assigned to which department or division within DEA?

AGENT GAUER:  I am assigned to the El Paso Division here in El Paso, Texas.

MR. SEARS:  I would like to direct your attention specifically to the matter of the defendant in this case, Mr. Gamez.  Are you familiar with the Defendant in this case?

AGENT GAUER:  I am.

MR. SEARS:  How are you familiar with the Defendant?

AGENT GAUER:  He was arrested on November 30th.  I met and interviewed him.

MR. SEARS:  During the course of your investigation, you had the opportunity to interact with the Defendant, correct?

AGENT GAUER:  Yes, sir.

MR. SEARS:  Can you identify him here in the courtroom?

AGENT GAUER:  Yes, sir.

MR. SEARS:  Can you please describe his appearance to us and where he is sitting to the Court?

AGENT GAUER:  Sitting at the first defense table next to his attorney wearing a blue jumpsuit.

MR. SEARS:  Your Honor, if the record would reflect the witness has identified the Defendant?

THE COURT:  Yes, sir.

MR. SEARS:  Thank you.

Special Agent, you mentioned that he was taken into custody by law enforcement on November 30th of this year.  Can you please tell the Court what drew law enforcement to -- drew the Defendant to law enforcement's attention on that day?

AGENT GAUER:  Yes, sir.  The United States Border Patrol agents out of Fort Hancock Border Patrol Station in the normal course of duties on November 30th detected their sensors they have along the international border were triggered.  The way they described it to me was triggered in series like one, two, three showing northbound incursion into the United States from Mexico.  Agents responded to the sensors, and they discovered vehicle tracks, and it appeared to be driven across the Rio Grande riverbed from Mexico into the United States.

Agents subsequently radioed their findings, and agents in the area converged on the area to try to pickup the sign on possible routes of ingress into the United States.  During those efforts, they found tire tracks on a dirt road called McNary Road.  McNary Road is slightly west of where the incursion was detected, and it runs north towards Texas 20 and I-10.

MR. SEARS:  Special Agent, let me stop you there.  That location, not the specific road but that general vicinity, is that an area known to law enforcement to be frequented by

drug traffickers bringing drugs from Mexico into the United States?

AGENT GAUER:  Yes, sir.

MR. SEARS:  Please continue with your description.

AGENT GAUER:  Those agents radioed their findings. They found tire tracks in the dirt road and also found a drive shaft to a vehicle laying in the middle of the road.  They radioed the findings up.

Other agents who had just gone off of duty were on Interstate 10, and they recognized a white truck driving significantly below the speed limit.  The driver was looking around, he is on the phone, looking nervous.  What tipped them off to take a closer look at the vehicle was how much slower it was going than the traffic, and it also had white plywood placed over the bed of the truck.

These agents from the Fort Hancock Station know that a ruse of placing white plywood over a white vehicle helps conceal contraband from surveillance in the air, and so, as such, they had two other incidents where this was found.  They radioed ahead because they were in the personal vehicles but had their government radios for working.  People on duty setup to interdict the white truck.  It was described as a white Chevrolet with Texas tags.

MR. SEARS:  Was the vehicle subsequently stopped?

AGENT GAUER:  A stop was attempted.  As the unit

pulled in behind Gamez, the Defendant -- the driver of the vehicle was subsequently identified as Isac Gamez Ruiz. He abruptly came to a stop on Interstate 10 at approximately mile marker 60, cut across the median, and began heading southbound through the desert in an attempt to flee.

MR. SEARS: When you say he attempted to flee, was he still in his vehicle or was he running on foot?

AGENT GAUER: Still in his vehicle at that time.

MR. SEARS: What happened at that time?

AGENT GAUER: The vehicle became stuck in what was described as a mesquite mound.

MR. SEARS: What happened when the vehicle became stuck?

AGENT GAUER: He was stranded, and agents came upon it and did what they described as a tactical approach and security clearance assuming that somebody was injured inside or hiding inside with a weapon. They come to the vehicle, and it was abandoned. They radioed the finding ahead. A drug detecting canine came out and sniffed, positive alert, and they find drugs.

The coincidence of all of this is they radioed their findings for agents in the area to attempt to interdict a fleeing subject. The precise time later, I'm not sure, about two miles away from where the vehicle was abandoned, Isac Gamez Ruiz was found trying to conceal himself in a canal

about ten meters, it was described, from the border as interdicted by Border Patrol ATV units.

Agents who had seen the vehicle while it was fleeing identified Gamez as the person who they saw driving it.  He was Mirandized, and taken into custody, and I was given a call and advised of the seizure.

MR. SEARS:  Special Agent, the location where the Defendant was found, the location where the vehicle was abandoned, are those both located within the Western District of Texas?

AGENT GAUER:  Yes, sir.

MR. SEARS:  You made a mention that a canine was brought out and drugs were found.  When you say drugs were found, were they found within the vehicle?

AGENT GAUER:  Yes, sir, the drugs were found.  The entire bed of the truck was full, and the cab was as full as it could be while keeping the driver's seat open.  It was described as 42 bundles.  Probably half of those were bundles and half were bins containing a substance that field tested positive for the properties of marijuana and approximately 483 kilograms.

MR. SEARS:  Special Agent, based upon your training and expertise, is that an amount consistent with distribution?

AGENT GAUER:  Yes, sir.

MR. SEARS:  After the drugs were recovered from the

abandoned vehicle in the desert and the Defendant was taken into custody, you were contacted to come assist with the investigation.  Can you please tell the Court what happened upon your arriving?

AGENT GAUER:  Upon my arrival, we inspected the vehicle that was pulled out of the desert.  It had to be towed.  It was missing a drive shaft and put on this four wheel drive using front two wheel drive wheels.  We inspected the drugs.

Myself, Special Agent Matthew Canon, FBI Special Agent [inaudible], and a Border Patrol agent, Mike Gamboa, escorted Mr. Gamez Ruiz to a private interview room.  We identified ourselves as federal agents and Mirandized him through Form DEA-13 Bravo and advised him of his rights in the Spanish language through an interpreter which was Agent Gamboa.

Mr. Gamez Ruiz agreed to speak to us about the circumstances of his arrest, and during the interview he admitted to driving the vehicle from Mexico into the United States.  He knew it was loaded with marijuana, and he admitted to being the driver of a load that was seized on February 2017 with 517 kilos of marijuana in it.

MR. SEARS:  How did the discussion about the previous February 2017 trafficking incident come up?  Did you show the Defendant any kind of evidence or photographs from that incident?

AGENT GAUER:  I did.  I brought photographs with me

prior to interviewing him.  One of them was of the previous event.  Mr. Gamez, during discussions, recalled during that day he had tried to flee back to Mexico, and the vehicle became stuck in the river, and he abandoned it.  He added he was wearing a hard hat and a vest that day.  The ruse was a construction truck, if you will.

MR. SEARS:  Special Agent, you mentioned there was a drug dog brought out to test or search for drugs when the vehicle was abandoned.  Based upon the sheer volume of marijuana found in that vehicle, was the odor of marijuana noticeable to a normal human nose that day?

AGENT GAUER:  I wasn't there.  It was done a security sweep of the vehicle.  They would have seen bundles consistent with marijuana.  I believe they were being overly cautious with the search of the plywood under the bed.

MR. SEARS:  The bundles were in plain view when they approached the vehicle?

AGENT GAUER:  The ones in the cab were.  The ones in the bed of the vehicle were not.

MR. SEARS:  Understood.  Special Agent, did the Defendant indicate to you how much he was going to be paid for his efforts?

AGENT GAUER:  He did not.

MR. SEARS:  Did the Defendant indicate to you who had provided him the drugs in Mexico?

AGENT GAUER:  Yes.

MR. SEARS:  Did the Defendant indicate the location he was to the take the drugs to within the United States?

AGENT GAUER:  No.  During our discussion, he told us he was on the phone with a woman here in the United States who was directing him where to travel to.

On that note, he was seen on the phone by agents, and, in the post arrest interview, he told us he had ditched his cell phone in the desert.

MR. SEARS:  So, the phone was not recovered?

AGENT GAUER:  It was recovered.

MR. SEARS:  It was recovered?  At this point, have you been able to identify whether or not -- get into the phone call to -- phone log to see if there was a phone call consistent with that timeframe?

AGENT GAUER:  It is still being processed.

MR. SEARS:  Thank you.

Special Agent, were you able to ascertain the nationality of the Defendant?

AGENT GAUER:  Mr. Gamez is a Mexican national.  We asked him if he had status in the United States, and he said he did not.

MR. SEARS:  Special Agent, were you also able to identify whether or not the Defendant has any kind of criminal conviction record?

AGENT GAUER:  His previous criminal history, I believe, is two federal immigration offenses in Arizona.

MR. SEARS:  That he was convicted for?

AGENT GAUER:  Yes, sir.

MR. SEARS:  Thank you very much.  Special Agent, those are all the questions I have for you.

Your Honor, we pass the witness.

THE COURT:  Thank you.

MR. HOLGUIN:  Good morning, Agent Gauer.

AGENT GAUER:  Good morning.

MR. HOLGUIN:  You got a call personally when the Border Patrol had already arrested Mr. Gamez and had already seized the vehicle, correct?

AGENT GAUER:  Correct.

MR. HOLGUIN:  You were not there prior to when the sensor activity had occurred and when the subsequent stop of the truck had happened?  You were not there personally?

AGENT GAUER:  Correct.

MR. HOLGUIN:  But you did speak to the agents to get a hold of what was going on and get a little bit of background on the case?

AGENT GAUER:  I spoke to the agents and read their report.

MR. HOLGUIN:  You mentioned the sensors.  I guess there was no video or any kind of camera that caught the

vehicle crossing the border from Mexico into the United States?

AGENT GAUER:  Not that I know of.

MR. HOLGUIN:  When the agents converged where the sensor activation occurs, they find tracks but no vehicle?

AGENT GAUER:  Correct.

MR. HOLGUIN:  There were no other people around there?

AGENT GAUER:  No.

MR. HOLGUIN:  This is about 3:45 or 4 o'clock in the afternoon?

AGENT GAUER:  That's how it is described, yes, sir.

MR. HOLGUIN:  Still light out?

AGENT GAUER:  Yes.

MR. HOLGUIN:  They haven't seen any vehicle or dust or anything?  They just see the tracks initially?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  You testified they tried to follow the sign.  Were they able to follow the sign to McNary Road or did they simply pickup tracks at McNary Road?

AGENT GAUER:  The way they described is they picked up tracks from McNary Road and finding the dropped drive shaft.

MR. HOLGUIN:  The dropped drive shaft on McNary Road?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  Had the agents been able to or have you been able to trace this drive shaft back to the vehicle that was found abandoned later?

AGENT GAUER:  Only so much as there is a drive shaft on McNary Road with the prints of the vehicle, and the seized vehicle was missing a drive shaft.

MR. HOLGUIN:  It was a [inaudible] drive shaft they found on McNary Road?

AGENT GAUER:  From my understanding, it was the drive shaft that enabled a 4 wheel drive.

MR. HOLGUIN:  Enabled the 4 wheel drive on the vehicle?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  The vehicle is a 4 wheel drive vehicle?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  From McNary Road, do they follow the tracks along that dirt road?

AGENT GAUER:  Not that I know of.  They used the radios to radio ahead their findings of the direction of travel of the suspected incursion.

MR. HOLGUIN:  Which is heading north towards Highway 20 and Interstate 10?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  You testified a different group of agents were driving to work when they see the vehicle that is suspicious too?

AGENT GAUER:  They were actually getting off a shift. This event happened at the shift change for Border Patrol.

MR. HOLGUIN:  Are they heading west towards El Paso?

AGENT GAUER:  I believe so, yes.  It is the direction of travel of the vehicle.

MR. HOLGUIN:  The vehicles were heading into El Paso?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  I forgot to ask you.  The area where the vehicle tracks were originally found with the sensor activation, you testified that was a known area of drug trafficking?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  Is it also a known area for people to cross in the country illegally?

AGENT GAUER:  Alien smuggling events, yes, sir.

MR. HOLGUIN:  You testified that the agents who see the vehicle, they radio in, and there is a few different things they observed that is suspicious about the vehicle?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  I guess it is driving, as you said, significantly slower than the posted speed limit?

AGENT GAUER:  It is how it was described, yes, sir.

MR. HOLGUIN:  Do you know how much slower it was driving?

AGENT GAUER:  At the station, they told me 10 mph so 70 in an 80 mph zone.  Enough to see traffic passing it.

MR. HOLGUIN:  Was it driving on the right hand side or

the --

AGENT GAUER:  They described the No. 2 lanes which would be the middle lane.

MR. HOLGUIN:  Middle lane?  They said there was also a white plywood covering the bed?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  And there were a couple of other vehicles with the plywood covering the bed that had also been found to have drugs in them previously?

AGENT GAUER:  One with drugs and one abandoned without drugs, sorry.

MR. HOLGUIN:  One abandoned without drugs?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  Was one of these the previous February 2017 event that you later spoke to Mr. Gamez about?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  That vehicle also had white plywood covering the bed?

AGENT GAUER:  It had plywood and like a [inaudible] material, yes, sir.

MR. HOLGUIN:  Underneath the bed?

AGENT GAUER:  On top of the bed.

MR. HOLGUIN:  On top of the bed and drugs?

AGENT GAUER:  And drugs underneath.

MR. HOLGUIN:  Was the white plywood an actual cover or

just boards of wood laid down on top of the bed?

AGENT GAUER:  You mean like when you say like a cover, like a fashioned functional cover?

MR. HOLGUIN:  I am saying like a big piece of wood that slides on top and is meant to provide a cover so nothing can fly out or that you would not be able to see into the bed?

AGENT GAUER:  It was fashioned in a manner where it was painted white on top, and to pull off is simply take it off manually.  There is no hinges or any other sophisticated mechanism to it.  Yes, to protect the view of the contents from the outside.

MR. HOLGUIN:  It is not just pieces of wood thrown on top?

AGENT GAUER:  One big piece of plywood.

MR. HOLGUIN:  One big piece of plywood, thank you. You mentioned also or agents mentioned they thought that the driver was being nervous?

AGENT GAUER:  Yes.

MR. HOLGUIN:  And what specific facts did they mention to you or did you read in the report that indicated that the driver was nervous?

AGENT GAUER:  Looking around excessively while driving, looking long and hard at the drivers as they were passing.  They described frantically trying to use the cell phone, but mostly his looking around the cab and looking at

every single vehicle that passed him.

MR. HOLGUIN:  Do you know for how long about what time this was happening they observed this vehicle?

AGENT GAUER:  It would have to be approaching 4 o'clock.

MR. HOLGUIN:  It would be close to when the original sensor activation occurred?

AGENT GAUER:  Within reason.

MR. HOLGUIN:  What does that mean?

AGENT GAUER:  It wasn't hours later.  It would be natural for an incursion to happen at one point and the same vehicle be involved in an event maybe 10 or 20 miles down the road.

MR. HOLGUIN:  What I am asking is if you have like a fact you can point to say the agents told me or I read in the report [inaudible]?

AGENT GAUER:  Not that I recall.

MR. HOLGUIN:  Was there any other signs of nervousness beyond what you testified to that you're aware of?

AGENT GAUER:  Not that I recall.

MR. HOLGUIN:  Those agents called a different group of agents to come out.  They were driving the personal vehicle?

AGENT GAUER:  They were driving the personal vehicles.

MR. HOLGUIN:  They don't intend to stop the truck?

AGENT GAUER:  No, sir, nor do they indicate the

truck's movement down the freeway.

MR. HOLGUIN:  It was a different group of agents that came out to attempt to stop the truck?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  I guess just the fact that one of them -- the vehicle stop was attempted that they go behind the vehicle and the agent hits his light?

AGENT GAUER:  He did not turn his lights on.  He saw the vehicle coming westbound and positioned his vehicle from the median to swing in behind him.  According to the agent who made the maneuver, that's when Gamez came to an abrupt stop on Interstate 10 west, came across the median southbound through the desert, and then emergency equipment turned on.

MR. HOLGUIN:  It was after that, not before that?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  It was just one vehicle that attempted the stop?

AGENT GAUER:  As far as I am aware of, yes.

MR. HOLGUIN:  And the vehicle continued south?

AGENT GAUER:  Yes.

MR. HOLGUIN:  And, at some point, I guess the vehicle gets stuck in the desert?

AGENT GAUER:  Yes.

MR. HOLGUIN:  [inaudible] Mexico?

AGENT GAUER:  No.

MR. HOLGUIN:  Do you know how far it was from the border?

AGENT GAUER:  No.

MR. HOLGUIN:  The agents arrived, and that's when they do a sweep of the vehicle?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  They don't find anybody there?

AGENT GAUER:  No people, no.

MR. HOLGUIN:  They find the drugs?

AGENT GAUER:  Yes.

MR. HOLGUIN:  And I guess you testified in the cab in the back of the truck?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  Did they find any weapons?

AGENT GAUER:  No.

MR. HOLGUIN:  And they don't see anybody run from the vehicle either?

AGENT GAUER:  I don't recall if they told me they saw footprints or if they saw him fleeing.  They had -- I don't think they saw him fleeing from the vehicle, no.  They came up too late.

MR. HOLGUIN:  They did not chase someone either?

AGENT GAUER:  No, they radioed ahead.  Another interdiction unit attempted to interdict on the way to the border.

MR. HOLGUIN:  All of the agents present who had visual sight of the person -- of the driver of the truck?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  Is it nighttime yet or it was still light out?  Do you know?

AGENT GAUER:  The way the time was working, it started getting towards dusk.

MR. HOLGUIN:  Later, Mr. Gamez is arrested in a canal about ten meters from the border?

AGENT GAUER:  It is how it was described, yes.

MR. HOLGUIN:  Do you know about what time it was he was arrested?

AGENT GAUER:  6:15.

MR. HOLGUIN:  Is that what is listed in one of the reports or someone told you?

AGENT GAUER:  I believe it is something someone told me was in their report.  I have to reference.

MR. HOLGUIN:  After that is when you were called in?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  You had actually been one of the agents that questioned Mr. Gamez?

AGENT GAUER:  I was.

MR. HOLGUIN:  Was the interview recorded in any way?

AGENT GAUER:  It was not.

MR. HOLGUIN:  No video or audio exists?

AGENT GAUER:  Only notes.

MR. HOLGUIN:  Only notes.  Did you ask Mr. Gamez to sign any kind of statement?

AGENT GAUER:  Written statement, no, sir.

MR. HOLGUIN:  Or prepare a written statement?

AGENT GAUER:  No, sir.

MR. HOLGUIN:  Was Mr. Gamez, when you arrived onsite, wet?

AGENT GAUER:  His clothes were wet.  He had been given a change of clothes.

MR. HOLGUIN:  So, he was already dressed in different clothing?

AGENT GAUER:  He was.

MR. HOLGUIN:  Than when he was arrested?

AGENT GAUER:  Yeah.

MR. HOLGUIN:  Did he request any kind of medical attention for his condition?

AGENT GAUER:  He did not.

MR. HOLGUIN:  Do you speak Spanish?

AGENT GAUER:  No, sir.

MR. HOLGUIN:  And does Mr. Gamez only speak Spanish?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  Someone else did the actual back and forth interview?

AGENT GAUER:  An agent served as interpreter between

Mr. Gamez and I.

MR. HOLGUIN:  You were doing the questions and someone else was the interpreter?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  Who was the agent that was the interpreter?

AGENT GAUER:  Border Patrol Agent Michael Gamboa.

MR. HOLGUIN:  Who was one of the agents that had originally seen the vehicle and called it in?

AGENT GAUER:  Yes, sir.

MR. HOLGUIN:  During the course of this investigation, was Mr. Gamez Mirandized?

AGENT GAUER:  He was.

MR. HOLGUIN:  Did he sign a Miranda waiver?

AGENT GAUER:  He did.

MR. HOLGUIN:  Did he request an attorney?

AGENT GAUER:  No.

MR. HOLGUIN:  At any time during the interview, did he ask to stop the interview because he was cold?

AGENT GAUER:  That he was cold, not that I know of.

MR. HOLGUIN:  Or for any reason?

AGENT GAUER:  He said he didn't feel good at one point.

MR. HOLGUIN:  You [inaudible]?

AGENT GAUER:  No, sir.

MR. HOLGUIN:  How long was the interview, sir?

AGENT GAUER:  Approximately an hour.

MR. HOLGUIN:  Did he answer all of your questions?

AGENT GAUER:  Yes.

MR. HOLGUIN:  Were there any questions he refused to answer?

AGENT GAUER:  Refused, no, sir.

MR. HOLGUIN:  You said you were unable to -- let me ask you.  He did tell you he was going to be paid?

AGENT GAUER:  Correct.

MR. HOLGUIN:  Did you ask him?

AGENT GAUER:  I don't recall.

MR. HOLGUIN:  Did you ask him who he was going to turn the vehicle over to?

AGENT GAUER:  Yes.

MR. HOLGUIN:  That's when he told you it was a contact with a woman?

AGENT GAUER:  Yes.

MR. HOLGUIN:  Do you know if the truck or the marijuana has been fingerprinted?

AGENT GAUER:  The marijuana has been fingerprinted.  I don't know if the truck has been fingerprinted.  The previous one, the previous truck was fingerprinted.  One vehicle was found in June 2018.  It is not going to be in the affidavit.  It was abandoned on the side of the road similar to a van like

this.  The fingerprints came back positive for fingerprints for Mr. Gamez.

MR. HOLGUIN:  That was -- the van -- that was an abandoned vehicle with drugs in it?

AGENT GAUER:  No drugs were found.

MR. HOLGUIN:  Where was that vehicle abandoned?

AGENT GAUER:  Off of I-10 near Fort Hancock.

MR. HOLGUIN:  What about this other vehicle that you had mentioned from May -- excuse me, February 2017?  Was that also fingerprinted?

AGENT GAUER:  I don't recall.

MR. HOLGUIN:  You also testified they were able to find a phone in the desert?

AGENT GAUER:  Yes.

MR. HOLGUIN:  Was this Mr. Gamez's phone?

AGENT GAUER:  That's yet to be determined.

MR. HOLGUIN:  You never showed it to him and said hey, is this your phone?

AGENT GAUER:  It was recovered the day after in the area in which he was apprehended.

MR. HOLGUIN:  You never showed it to him?

AGENT GAUER:  No, I have not.

MR. HOLGUIN:  The other agents have shown it to him?

AGENT GAUER:  No.

MR. HOLGUIN:  Have you been able to find any pictures

of Mr. Gamez or any information indicating it belongs to him?

AGENT GAUER:  We haven't been able to do anything with the phone yet.

MR. HOLGUIN:  Have there been any fingerprints of the phone?

AGENT GAUER:  Not yet.

MR. HOLGUIN:  The truck that was abandoned, it was registered to Mr. Gamez?

AGENT GAUER:  No.

MR. HOLGUIN:  I will pass the witness, Your Honor.

THE COURT:  Thank you.  Anything else?

   Thank you, Agent.

MR. HOLGUIN:  I have nothing further, Your Honor.

THE COURT:  The Court will find probable cause and grant the Government's motion to detain.

* * * * *

CERTIFICATION
_____

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Date:   December 11, 2018

/s/ Walter A. Chiriboga, Jr.
_____
Walter A. Chiriboga, Jr.